UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

      v.

BRIAN RAY,                                   20-CR-120
                                                    DECISION

            Defendant.
_____

Before the Court is an objection to the Presentence Investigation Report ("PSR") filed by the defendant, Brian Ray. Docket Item 147. The PSR found that for purposes of calculating the sentencing range under the United States Sentencing Guidelines Manual ("Guidelines" or "U.S.S.G."), Ray's relevant conduct included at least 700 but less than 1,000 kilograms of converted drug weight, for a base offense level of 28. Docket Item 137 at 11; *see* U.S.S.G. § 2D1.1(c)(6) (U.S. Sent'g Comm'n 2021).[1] Ray argues that he should be responsible for at least 60 but less than 80 kilograms of converted drug weight, for a base offense level of 20. Docket Item 147 at 2; *see also* Docket Item 192. The government agrees with the PSR. *See* Docket Items 150 and 191.

For the reasons that follow, this Court finds that Ray's relevant conduct includes at least 400 but less than 700 kilograms of converted drug weight, which results in a base offense level of 26.

---

[1] The Guidelines explain that "converted drug weight" is used "to determine the offense level for controlled substances that are not specifically referenced in the Drug Quantity Table or when combining differing controlled substances." U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (K).

## BACKGROUND

On May 27, 2021, Ray pleaded guilty to one count of possessing with intent to distribute and distributing butyryl fentanyl in violation of 21 U.S.C. § 841(a)(1).  Docket Items 109 and 110.  On August 18, 2021, the United States Office of Probation and Pretrial Services ("Probation Office") filed a PSR, finding that Ray's "offense involved at least 700 kilograms, but less than 1,000 kilograms[,] of Converted Drug Weight, which provides for a base offense level of 28."  Docket Item 137 at 11 (citing U.S.S.G. § 2D1.1(c)(6)).  The Probation Office based that finding on its conclusion that the larger conspiracy in which Ray participated involved approximately 9 grams of heroin, approximately 28 grams of butyryl fentanyl, and approximately 39 grams of mixtures containing two or more of the following: fentanyl, butyryl fentanyl, acetyl fentanyl, heroin, and/or furanyl UF-17.  *See id.* at 6-7.

On October 19, 2021, Ray objected to the PSR's calculation of his base offense level, arguing that he should be held accountable only for the five sales in which he personally participated, totaling "7.4 grams of fentanyl"; according to Ray, that "translates to [at least] 60 but less than 80 kilograms of Converted Drug Weight," for a base offense level of 20.  Docket Item 147 at 2.  Ray further requested an evidentiary hearing under *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), so that the Court could resolve the factual dispute.  Docket Item 147 at 2-3.

On November 5, 2021, the government responded. Docket Item 150.  On November 10, 2021, the Probation Office filed a revised PSR, Docket Item 151, in which it responded to Ray's objection and maintained its finding of a base offense level of 28,

*see id.* at 11, 23-25.  And on April 6, 2022, this Court held the *Fatico* hearing that Ray requested.  *See* Docket Item 185.

Scott Sprague, a Task Force Officer with the United States Drug Enforcement Administration ("DEA"), testified for the government.  *See* Docket Item 187 at 8.  Sprague said that in his role as a Task Force Officer, he "work[s] narcotics cases every day."  *Id.* at 9.  He explained that one technique task force officers use is conducting "controlled purchases," where either an informant or an undercover officer buys drugs from a "target."  *Id.* at 9-10.

Relevant to this case, Sprague testified that in the fall of 2019, he received information that an individual known as "Slim" was selling heroin and fentanyl in the area of Broadway Avenue and Strauss Street in Buffalo, New York.  *Id.* at 10.  The DEA conducted an investigation in conjunction with the New York State Police, identified "Slim" as Ray's co-defendant Mark Greaman, and obtained a phone number for him.  *Id.* at 10-11.

Sprague further testified that on October 17, 2019, an undercover officer called Greaman's phone number to arrange for a controlled purchase.  *Id.* at 12-14.  The person who answered the phone "directed [the undercover officer] to go to the area of Peckham and Madison."  *Id.* at 13-14.  The officer then purchased narcotics from an individual who was later identified as Ray.  *Id.* at 12-14.  Sprague said that he was "surprised that . . . Greaman did not did not show up to conduct that controlled purchase" because "[t]he way things had transpired before when that phone number was contacted, . . . Greaman would show up."  *Id.* at 14.  Sprague stated that "[w]hat we learned after that purchase, was that when [Greaman] would be out of town, he would

3

give the phone to [Ray]," who "would conduct sales while Mr. Greaman was away." *Id.* at 15; *see also id.* at 17 (Sprague's explaining that "Mr. Ray used Mr. Greaman's phone when Mr. Greaman was not available.").

Sprague then described four subsequent controlled purchases in which an undercover officer called a number associated with Greaman but Ray conducted the sale. *Id.* at 17-26. In total, Ray was involved in five controlled purchases in which "Ray would service [Greaman's] customers through [Greaman's] phone number" when "Greaman was not available." *Id.* at 32.

Law enforcement conducted a total of 40 controlled purchases using undercover officers as part of the investigation involving Greaman. *Id.* at 11. Those purchases were made from four individuals: Greaman, Ray, Damon McNamee, and Christopher Cook. *Id.* Sprague noted that in contrast to their purchases from Ray, the undercover officers did not go through Greaman to buy from McNamee and Cook; rather, the officers had direct "phone numbers for those individuals." *Id.* at 32.

After Sprague testified, the government rested. *Id.* at 34. The defendant did not present any evidence. *Id.*

## DISCUSSION

I. **LEGAL PRINCIPLES**

   A. **Drug Weight and Guidelines Calculation**

The now-advisory Guidelines, *see United States v. Booker,* 543 U.S. 220 (2005), are the requisite starting point for a district court's determination of a sentence. *Rita v. United States,* 551 U.S. 338, 350 (2007). Under the Guidelines, a defendant's sentencing range is calculated using a base offense level; any adjustments to that level

4

based on specific offense characteristics, the defendant's role in the offense, and whether the defendant accepted responsibility for the offense; and the defendant's criminal history category. *See* U.S.S.G. § 1B1.1(a).

The base offense level for a violation of the statute to which Ray pleaded guilty—21 U.S.C. § 841(a)(1)—is affected by the weight of the drugs involved. *See* U.S.S.G. § 2D1.1(c). That weight is not limited to that of the drugs charged in the indictment, however, and includes the weight of all drugs connected to the defendant's relevant conduct. *See United States v. Madkour*, 930 F.2d 234, 237 (2d Cir. 1991); *see also Booker*, 543 U.S. at 233-35.

"[I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," relevant conduct includes:

> all acts and omissions of others that were—
>
>> (i) within the scope of the jointly undertaken criminal activity,
>>
>> (ii) in furtherance of that criminal activity, and
>>
>> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B). "The defendant need not have actual knowledge of the exact quantity of narcotics involved in the entire conspiracy; rather, it is sufficient if he could reasonably have foreseen the quantity involved." *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006).

B.     **Evidentiary Standards in Sentencing**

Even though a defendant is adjudged guilty by the time of sentencing, the defendant's due process rights are not checked at the courtroom door.  *See United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986).  For that reason, the sentencing court must balance the defendant's procedural rights with the defendant's guilt and the need to impose a fair punishment.  *See id.*

A sentencing court has broad discretion in deciding what information to consider:  So long as the defendant is afforded an opportunity to respond and information has some indicia of reliability to ensure that it is likely accurate, the information is fair game and the formal rules of evidence do not apply.  *United States v. Concepcion*, 983 F.2d 369, 387-88 (2d Cir. 1992); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").  By the same token, "[u]nreliable allegations shall not be considered" by the sentencing court.  U.S.S.G. § 6A1.3 cmt.  And if the reliability of certain information is challenged, corroborating evidence can help the court determine whether the information is, in fact, reliable.  *United States v. Romano*, 825 F.2d 725, 728-29 (2d Cir. 1987); *Fatico*, 579 F.2d at 713.

At a trial, the government must prove a defendant's guilt beyond a reasonable doubt, but at a sentencing hearing, the government must prove the relevant facts only by a preponderance of the evidence.  *See United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007) (per curiam).  Drug weight, like any other sentencing factor, is determined by a preponderance of the evidence.  *See United States v. Cordoba-Murgas*, 233 F.3d

6

704, 708 (2d Cir. 2000). Although some Second Circuit case law may suggest a more robust evidentiary standard of "specific evidence" for uncharged drug weights, *United States v. Shonubi*, 103 F.3d 1085, 1089-90 (2d Cir. 1997), the Second Circuit later made clear that even in light of such language there is no reason—and, in fact, no legal authority—to depart from the preponderance-of-the-evidence standard, *see United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008); *Cordoba-Murgas*, 233 F.3d at 708-09.

## II.   ANALYSIS

Here, Ray was charged with one count of conspiring to possess with intent to distribute, and to distribute, 10 grams or more of a mixture containing butyryl fentanyl, acetyl fentanyl, and furanyl UF-17, in violation of 21 U.S.C. § 846 (Count 1); three counts of possessing with intent to distribute, and distributing, butyryl fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2 (Counts 2, 11, and 13); one count of possessing with intent to distribute, and distributing, butyryl fentanyl and furanyl UF-17, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2 (Count 12); and one count of possessing with intent to distribute, and distributing, butyryl fentanyl, heroin, furanyl UF-17, and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 38). Docket Item 1. Ray pleaded guilty only to Count 2 (distributing butyryl fentanyl on October 17, 2019), *see* Docket Items 109 and 110, however, and in the plea agreement, the government agreed to move to dismiss all other counts at the time of sentencing, Docket Item 109 at 7.

No drug weight was specified in Count 2. Docket Item 1 at 2. Therefore, any drug weight—for both the drugs that were included in that count, as well as the drugs

7

that encompass relevant conduct—must be proved by a preponderance of evidence. As explained above, to be deemed relevant conduct, the actions at issue must be "(i) within the scope of the jointly undertaken criminal activity" to which Ray pleaded guilty, "(ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).

The government argues that this Court should attribute the drug weight from all 40 controlled buys to Ray.  Docket Item 191 at 4-7.  More specifically, the government urges that Ray "should be held to account for the entirety of [the charged] conspiracy" because "[a]lthough there is a lack of evidence as to the pooling of money, the narcotics dealing occurred in the same area near Broadway Avenue and Strauss Streets, contained a similarity in mixtures and substances demonstrating a common source, and the defendant worked hand-in-hand with Mr. Greaman when Mr. Greaman was unavailable."  *Id.* at 7.  Accordingly, "the government advocates that the defendant's relevant conduct is at least 700 kilograms but less than 1,000 kilograms of Converted Drug Weight for a Base Offense Level of 28."  *Id.*

"In the alternative," the government suggests, "should this Court decline to apply the entirety of the narcotics conspiracy to the defendant, at a minimum, the defendant should be held accountable for his sales and Mr. Greaman's sales, due to his close association with Mr. Greaman."  *Id.*  Ray "sold approximately 7.4 grams of fentanyl analogs," and "Greaman sold approximately 33 grams containing fentanyl analogs and 9 grams of heroin."  *Id.* at 8.  "Combining these sales," the government explains, "would result in the relevant conduct being at least 400 kilograms but less than 700 kilograms of Converted Drug Weight for a Based Offense Level of 26."  *Id.*

8

Ray, by contrast, contends that he should be held accountable only for the five sales in which he participated.  Docket Item 192 at 4.  Ray argues that "[t]his case can be looked at as two separate conspiracies, one between Greaman and Ray and one between Greaman and the other co-defendants."  *Id*.  "As such," Ray continues, "it appears that the government did not provide sufficient, credible evidence that the agreement was other than the five (5) transactions" in which Ray participated.  *Id.*

Based on the evidence presented at the *Fatico* hearing regarding Ray's use of Greaman's phone, this Court finds that Greaman's own direct sales were within the scope of the criminal activity that Ray undertook and were reasonably foreseeable to Ray.  Indeed, Ray concedes that there was a conspiracy "between Greaman and Ray," *id.*, but fails to explain why Greaman's sales were not jointly undertaken by or reasonably foreseeable to Ray.  So Greaman's sales are part of Ray's relevant conduct, and the drug amounts involved in those sales are correctly included in calculating Ray's offense level.

That being said, this Court agrees with Ray that the government failed to sufficiently link the sales made by Cook and McNamee to him.  As Ray observes, *id.* at 3, the Second Circuit has held that "the scope of conduct for which a defendant can be held accountable under the [Guidelines] is significantly narrower than the conduct embraced by the law of conspiracy."  *United States v. Rigo*, 649 F. App'x 107, 108 (2d Cir. 2016) (summary order) (quoting *United States v. Perrone,* 936 F.2d 1403, 1416 (2d Cir. 1991)).  "This is because 'the emphasis in substantive conspiracy liability is the scope of the *entire conspiracy,*' while 'the emphasis under [the Guidelines] is the scope of the *individual defendant's* undertaking.'"  *Id.* (emphases in original) (quoting *United*

9

*States v. Spotted Elk,* 548 F.3d 641, 673-74 (8th Cir. 2008)). "As the commentary to the relevant section of the Guidelines explains, 'the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct' for sentencing purposes." *Id.* (quoting U.S.S.G. § 1B1.3 cmt. n.3(B)).

Here, there is no evidence that Ray was aware of—let alone agreed to jointly undertake—the sales conducted by Cook and McNamee. Indeed, the government all but concedes that Ray worked only with Greaman. *See* Docket Item 191 at 5 ("As is clear, the defendant worked in concert with his other co-conspirators, *namely Mr. Greaman*[,] to further the objectives of this conspiracy." (emphasis added)). And as noted above, while Greaman and Ray shared a phone to sell drugs, Cook and McNamee had their own phones. *See* Docket Item 187 at 32. So even if the source of the drugs was the same for all the sales, Greaman's sales are both within the scope of Ray's jointly undertaken criminal activity and reasonably foreseeable to Ray, but the other sales are not.

The government argues that "every other defendant has agreed to the scope of this conspiracy, as evidenced in their plea agreements." Docket Item 191 at 5. But none of those plea agreements mentions Ray. *See* Docket Items 74, 84, and 106. Moreover, while it is true that "[t]his Court accepted the [Probation Office]'s finding as to this relevant conduct when it sentenced Christopher Cook, Mark Greaman, and Damone McNamee, Sr.," Docket Item 191 at 5 (citing Docket Items 126, 175, and 188),

10

unlike Ray, the three co-defendants all pleaded guilty to Count 1—the conspiracy count. Thus, the government is not correct that Ray's "case is no different" than his co-defendants' cases. *Id.* And while the government argues that "[t]he unique quality of this fentanyl analog, along with the other similar types of drugs sold by his co-conspirators, helps demonstrate that the defendant and his co-defendants share a common source of supply," it concedes that sharing a source of supply alone is insufficient to render other individuals' sales relevant conduct. Docket Item 191 at 6.

For all those reasons, this Court finds that the government has not shown by a preponderance of evidence that the controlled purchases from McNamee and Cook constitute relevant conduct for Ray. Accordingly, the Court finds the following drug weights attributable to Ray: (1) approximately 40.4 grams of fentanyl analogs (approximately 7.4 grams from the five controlled buys in which he participated plus approximately 33 grams from the controlled buys in which Greaman participated), and (2) approximately 9 grams of heroin from the controlled buys in which Greaman participated. *See id.* at 8; *see also* Docket Item 151 at 6-10. That results in approximately 404 kilograms of converted drug rate for the fentanyl analogs and 9 kilograms of converted drug weight for the heroin. *See* U.S.S.G. § 2D1.1 cmt. n.8(D) (explaining that 1 gram of fentanyl analogs equals 10 kilograms of converted drug weight, and 1 gram of heroin equals 1 kilogram of converted drug weight). The amount for which Ray is responsible therefore totals 413 kilograms of converted drug weight, which generates a base offense level of 26 under the Guidelines. U.S.S.G. § 2D1.1(c).

**CONCLUSION**

For the reasons stated above, this Court finds that Ray is responsible for approximately 40.4 grams of fentanyl analogs and 9 grams of heroin, which results in a converted drug weight of approximately 413 kilograms and a base offense level of 26.

As previously ordered, *see* Docket Item 196, the date for sentencing will be August 31 at 3:00 p.m.

SO ORDERED.

Dated:   August 30, 2022
         Buffalo, New York

                                              */s/ Lawrence J. Vilardo*
                                              LAWRENCE J. VILARDO
                                              UNITED STATES DISTRICT JUDGE